1  Eric J. Buescher (Bar No. 271323)
2  eric@baykeeper.org
   Nicole C. Sasaki (Bar No. 298736)
3  nicole@baykeeper.org
   Christina D. Ralston (Bar No. 362848)
4  christie@baykeeper.org
   SAN FRANCISCO BAYKEEPER
5  1736 Franklin Street, Suite 800
   Oakland, California 94612
6  Telephone: (510) 735-9700
7
   William Carlon (Bar No. 305739)
8  william@carlonlaw.com
9  LAW OFFICE OF WILLIAM CARLON
   437 Post Street
10 Napa, California 94559
   Telephone: (530) 514-4115
11
12 Attorneys for Plaintiff
   SAN FRANCISCO BAYKEEPER
13

14              UNITED STATES DISTRICT COURT

15            NORTHERN DISTRICT OF CALIFORNIA

16

17 SAN FRANCISCO BAYKEEPER, INC., a          Civil No.
   California non-profit corporation,
18
19              Plaintiff,                   COMPLAINT FOR DECLARATORY
                v.                           AND INJUNCTIVE RELIEF AND CIVIL
20                                           PENALTIES
   CITY OF BERKELEY and COMMUNITY
21 CONSERVATION CENTERS, INC.,               1. **Clean Water Act – Stormwater Discharges
                                                Without Complying with Technology
22              Defendants.                      Based Effluent Limitations**
                                             2. **Clean Water Act – Failure to Have a Valid
23                                              Storm Water Pollution Prevention Plan**
                                             3. **Clean Water Act – Failure to Develop and
24                                              Implement Adequate Monitoring Plan**
                                             4. **Clean Water Act – Failure to Report as
25                                              Required**
26

27

28

COMPLAINT

Plaintiff San Francisco Baykeeper ("Baykeeper"), by and through its counsel, alleges as follows:

## I.    INTRODUCTION

1.        This is a citizen suit enforcement action, brought pursuant to section 505(a)(1) of the Federal Water Pollution Control Act (the "Clean Water Act" or "Act"), 33 U.S.C. § 1365(a)(1), to address violations of the Act by Defendants City of Berkeley ("City") and Community Conservation Centers, Inc. ("CCC") (collectively, "Defendants") arising out of Defendants' operations of the Berkeley City Transfer Station and Recycling Center (the "Facility"). Since at least December 18, 2020, Defendants have been discharging and continue to discharge polluted stormwater from the Facility, in violation of the express terms and conditions of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311, 1342.

2.        Since at least December 18, 2020, Defendants have also violated the General Industrial Stormwater Permit issued by the State of California, National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001 [State Water Resources Control Board] Water Quality Order No. 2014-0057-DWQ as amended by Order No. 2015-0122-DWQ in 2015 and by Order No. 2018-0028-DWQ in 2018 ("Industrial Stormwater Permit").

3.        Baykeeper seeks a declaratory judgment and injunctive relief to stop Defendants' illegal pollution of San Francisco Bay, the imposition of civil penalties, and the award of costs, including attorney and expert witness fees, for Defendants' repeated and ongoing violations of the Act.

## II.    JURISDICTION AND VENUE

4.        This Court has subject matter jurisdiction over the parties and this action pursuant to section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1), 28 U.S.C. § 1331 (an action arising under the laws of the United States), and 28 U.S.C. § 2201 (declaratory relief).

5.        The relief requested is authorized pursuant to 28 U.S.C. §§ 2201–02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief and civil penalties); and 33 U.S.C.

§§ 1319(d), 1365(a) (civil penalties).

6.          On or about December 18, 2025, Baykeeper provided notice of intent to file suit against Defendants for Defendants' Act violations ("Notice Letter") to Defendants and to: the Administrator of the United States Environmental Protection Agency ("EPA"); the Regional Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, San Francisco Bay Region ("Regional Board") (collectively, "state and federal agencies"), as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A copy of the Notice Letter is attached as **Exhibit 1**.

7.          More than sixty (60) days have passed since the Notice Letter was mailed to Defendants and the state and federal agencies. Neither EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. No claim in this action is barred by any prior administrative action pursuant to section 309(g) of the Act, 33 U.S.C. § 1319(g).

8.          Venue is proper in the Northern District of California pursuant to section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

9.          Intradistrict assignment of this matter to the San Francisco or Oakland Division of the Court is appropriate pursuant to Civil Local Rule 3-2(d). The events or omissions which give rise to Baykeeper's claims occurred in Alameda County, which is under the jurisdiction of the San Francisco or Oakland Division of the Northern District of California.

### III.    PARTIES

#### A.    Plaintiff

10.          Plaintiff Baykeeper, d/b/a San Francisco Baykeeper, is a non-profit public benefit corporation organized under the laws of the State of California with its main office at 1736 Franklin Street, Suite 800, Oakland, California 94612. Baykeeper's approximately 3,500 members live and/or recreate in and around the San Francisco Bay area. Baykeeper's mission is to defend San Francisco Bay from the biggest threats and hold polluters and government agencies

accountable to create healthier communities and help wildlife thrive. Its team of scientists and lawyers investigate pollution via aerial and on-the-water patrols, strengthen regulations through science and policy advocacy, and enforce environmental laws on behalf of itself, its members, and the public. To further its mission, Baykeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

11.     Members of Baykeeper, including citizens, taxpayers, property owners, and residents, live, work, and travel near, and recreate in, San Francisco Bay, into which Defendants discharge pollutants. Baykeeper's members use and enjoy San Francisco Bay for recreational, educational, scientific, conservation, aesthetic, spiritual, and other purposes. Baykeeper's members' use and enjoyment of these waters are negatively affected by the pollution caused by the Facility's operations. Defendants' discharges of stormwater containing pollutants impair each of these uses and thus harms Baykeeper and its members. Thus, the interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Act and the Industrial Stormwater Permit.

12.     Baykeeper members use the areas downstream of the Facility including in and along San Francisco Bay to bird watch, view wildlife, fish, kayak, sail, boat, stand up paddleboard, wade and swim, hike, bike, walk, run, and sightsee, as well as for aesthetic enjoyment. Additionally, Baykeeper and its members use local waters to engage in educational and scientific study through pollution and habitat monitoring and restoration activities.

13.     The Facility's historic and ongoing discharges of pollutants into San Francisco Bay in violation of the Clean Water Act have, are, and continue to adversely affect the interests of Baykeeper and its members.

14.     The interests of Baykeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the Clean Water Act. The relief sought herein will redress the harms to Plaintiff caused by Defendants' activities.

15.     Baykeeper has one or more members who use, explore, and recreate in areas impacted by the stormwater pollution herein at issue and could sue in their own right.

16.     Baykeeper brings this action on behalf of itself and its members. Neither the claims brought by Baykeeper nor the relief Baykeeper requests requires the participation of individual members.

17.     Baykeeper's injuries-in-fact are traceable to Defendants' conduct and would be redressed by the requested relief.

18.     Defendants' continuing failure to comply with the Clean Water Act and state and federal laws and regulations relating to the protection of waters of the United States has harmed, and will continue to directly and substantially harm, the interests of Baykeeper's members', hundreds of species of wildlife, and residents of the Bay Area. A decree declaring Defendants have violated the Clean Water Act, and granting the various other remedies sought herein, will redress Baykeeper's harms.

19.     Some of Baykeeper's members will suffer recreational, aesthetic, or other environmental injuries due to Defendants' pollution. Baykeeper's members use and enjoy San Francisco Bay and its tributaries for recreational, scientific, and aesthetic purposes and would reasonably cease these activities should San Francisco Bay's water quality become too degraded.

20.     Defendants' stormwater pollution frustrates Baykeeper's mission. Baykeeper has diverted its limited resources to investigate, research, gather documents from regulatory agencies, and consult with experts in order to understand the extent of the harm Defendants' ongoing pollution causes in and around San Francisco Bay. Baykeeper has dedicated substantial resources and time into its work and investigation regarding Defendants' stormwater pollution. At the time Baykeeper undertook its investigation into the Facility, the resources spent were not related to any litigation. Baykeeper would have used its limited resources on other matters had it not been for Defendants' conduct.

21.     Continuing the commission of the acts and omissions alleged herein will cause irreparable harm to Baykeeper and its members, for which there is no adequate remedy at law.

**B.     Defendants**

22.     Defendant City of Berkeley is a municipal corporation located in Alameda, County, California that owns the entire Facility and operates the Transfer Station. The Recycling Center is

operated by Defendant CCC under a contract with the City. The June 11, 2015 Notice of Intent for the Facility to operate under the terms of the Industrial Stormwater Permit named the City as the owner and/or operator of the Facility.

23.     Defendant Community Conservation Centers, Inc. is an active California corporation located at 1563 Solano Avenue, #106 in Berkeley, California. The Recycling Center is operated by Defendant CCC under a series of contracts with the City. In 2018, the City and CCC entered into Contract No. 31900055 which provided for the operation of the Recycling Center by CCC beginning December 1, 2018 and ending June 30, 2020. This contract was extended to June 30, 2021. Contract 32100199 further extended CCC's operation of the Recycling Center from July 1, 2021 to June 30, 2026, and provided an option to extend for an additional five-year term. Contract No. 32100199 requires CCC to "cooperate with the City in complying with provisions of the City's existing or new Storm Water Pollution Prevention Permits or related permits and requirements, including implementation of all reasonable and required Best Management Practices with respect to storm water pollution." Additionally, the City's Storm Water Pollution Prevention Plan ("SWPPP") for the Facility identifies the "Community Conservation Center" as the operator of the Recycling Center.

### C.     The Facility

24.     The Facility consists of the Transfer Station, located at 1201 2nd Street and the Recycling Center, located at 669 Gilman Street, in Berkeley, California. The Facility is approximately 7.1 acres. According to the Facility's Notice of Intent to comply with the Industrial Stormwater Permit, 98% of the site is impervious and 2 acres are exposed to storm water; however, Plaintiff estimates, using Google Earth satellite imagery, that the area exposed to storm water is closer to 5 acres or more.

25.     Industrial activities at the Transfer Station include, but are not limited to: accepting solid waste at the transfer station and tipping floor, processing and transporting solid waste, equipment maintenance, storage of used oil, fueling, washing equipment, maintenance of containers, storage of containers, bins, and hazardous waste, receiving and processing green waste, electronic waste, construction debris, and general waste, and operation of equipment in

support of these activities.

26.          Industrial activities at the Recycling Center include but are not limited to: processing recyclables (i.e., plastic, glass and paper) collected by residential curbside, commercial pick-up, buyback, and drop-off recycling programs.

27.          According to its SWPPP, the Transfer Station collects and discharges storm water associated with industrial activities at the Facility through at least four discharge locations, DP-1A, DP-2A, DP-3A, and DP-4, associated with four catchment areas. According to the Facility's SWPPP, the majority of stormwater runoff from the Transfer Station flows into trench drains TD-1, TD-2, and TD-2A and stormwater catch basins CB-1, CB-2, CB-3, and CB-3A which drain to stormwater treatment vaults. Catchment Area A discharges to DP-1A. Catchment Area B is routed into trench drains TD-3 in front of the Construction Debris receiving area and another trench drain TD-4 near the General/Electronic Waste Storage Area that delineates Catchment Areas A and B. Stormwater collected from trench drains TD-3 and TD-4 is routed to a 21,000 gallon above ground stormwater holding tank for discharge into the East Bay Municipal Utility District ("EBMUD") sanitary sewer during dry days under permit. Catchment Area D discharges to DP-4, and drains an area of the site comprised of employee parking, container bin storage and truck parking offsite from a driveway into the City's MS4.

28.          The Facility's SWPPP states that the Recycling Center has two Catchment Areas (E and F) which drain to discharge locations DP-5A, DP-6, DP-8A, and DP-9. DP-8A is located in a catch basin which drains directly to the Berkeley Municipal Separate Storm Sewer System ("MS4"), while DP-5A, and DP-6 discharge to Second Street, and then into the MS4. DP-9 discharges to Gilman Street, and then into the MS4. The Recycling Center also includes trench drains installed in front of the Glass Sorting and Container Storage areas, and they collect stormwater from source areas for temporary storage in two 4,000 gallon tanks which are then discharged into the EBMUD sanitary sewer during dry days. Stormwater from the Customer Recyclable Area and near the Ecology Center Offices and Storage Shed is directed via a berm and canopy structure to DP-5A.

29.          The industrial activities are sources of pollutants at the Facility. Pollutants of

COMPLAINT                                                                                                    6

concern from these industrial areas and activities at the Facility include total suspended solids ("TSS"), oil and grease ("O&G"), chemicals affecting the chemical oxygen demand ("COD") of storm water discharges, aluminum ("Al"), iron ("Fe"), zinc ("Zn"), lead ("Pb") and copper ("Cu"). Sources of these pollutants include the waste processing activities discussed above, material and waste transfer activities, tracking of soils, dust, debris, and waste from other areas and offsite from trucks, leaks from trucks, trailers, equipment, and other vehicles. These pollutants are entrained in stormwater runoff and can be tracked offsite by vehicles and other equipment.

30.        Polluted industrial stormwater from the Facility is discharged to the MS4, then to Central San Francisco Bay at the Gilman Street Outfall, less than a quarter mile from the Facility.

31.        Central San Francisco Bay is bounded to the north by San Pablo Bay, with a dividing line between Point San Pablo and Point San Pedro, bounded to the east by the East Bay, to the west by San Francisco and Marin County, and bounded to the south by Lower San Francisco Bay, with a dividing line south of Alameda Island. Central San Francisco Bay is habitat for several endangered and threatened species, including the Salt Marsh Harvest Mouse and Tidewater Goby. Central San Francisco Bay is on the 303(d) list of impaired waterbodies for chlordane, DDT (Dichlorodiphenyltrichloroethane), dieldrin, dioxin (including 2,3,7,8-Tcdd), furan compounds, mercury, non-native aquatic plants, polychlorinated biphenyls (PCBs), selenium, and trash.

### IV.    REGULATORY BACKGROUND

#### A.    The Problem of Stormwater Pollution

32.        Stormwater runoff is one of the most significant sources of water pollution in the nation and has been recognized as a leading cause of significant and cumulative harmful impacts to the water quality of San Francisco Bay. With every rainfall event, hundreds of millions of gallons of polluted stormwater flow from industrial sites, such as the Facility, and into storm drains, local waterways, wetlands, and San Francisco Bay.

33.        The consensus among agencies and water quality specialists is that stormwater pollution accounts for more than half of the total pollution entering local creeks, rivers, and coastal waters each year.

COMPLAINT                                                                                   7

34.     San Francisco Bay and its connected surface waters are ecologically sensitive areas and are essential habitat for numerous cetacean, fish, bird, and other species.

35.     These waters also provide recreational activities, including fishing, swimming, surfing, kayaking, and boating. They also provide non-contact recreational and aesthetic opportunities such as biking, wildlife observation, educational activities, and opportunities for research.

36.     Industrial facilities like Defendants' that discharge stormwater contaminated with sediment, heavy metals, and other harmful pollutants contribute to impairment of waters and aquatic dependent wildlife, expose the people of Berkeley to toxins, and harm the special social, economic, and aesthetic benefits that San Francisco Bay Area has for locals and visitors from around the world.

37.     Stormwater runoff from industrial sites such as the Facility causes harm to humans and aquatic life. Stormwater can contain heavy metal pollutants such as aluminum, cadmium, copper, iron, lead, mercury, nickel, selenium, tin, and zinc, as well as high concentrations of TSS, and COD. Exposure and ingestion of heavy metals can cause health problems in people and aquatic animals, including neurological, physiological, and reproductive effects. Heavy metals have been shown to alter activity in tissues and blood of fish.

38.     High concentrations of TSS degrade optical water quality by reducing water clarity and decreasing light available to support photosynthesis. TSS have been shown to alter predator-prey relationships. Deposited solids alter habitat for fish, aquatic plants, and benthic organisms. TSS can also be harmful to aquatic life because numerous pollutants, including metals and polycyclic aromatic hydrocarbons (PAHs), are adsorbed onto TSS. Thus, higher concentrations of TSS mean higher concentrations of toxins associated with those sediments. Inorganic sediments, including settleable matter and suspended solids, have been shown to negatively impact species richness, diversity, and total biomass of filter feeding aquatic organisms on bottom surfaces.

39.     Controlling polluted stormwater and non-stormwater discharges is essential to protecting San Francisco Bay.

**B.      The Clean Water Act**

40.      The Clean Water Act is the primary federal statute protecting surface waters in the United States. The Act aims to prevent, reduce, and eliminate pollution in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

41.      In order to accomplish that goal, section 301(a), 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharger complies with other enumerated sections of the Act, including the prohibition on discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402, 33 U.S.C. § 1342(b). *See also* 40 C.F.R. § 122.26(c)(1) and Industrial Stormwater Permit, § I.A.12.

42.      The "discharge of a pollutant" means, among other things, the addition of a pollutant to "waters of the United States" from any "point source." 40 C.F.R. § 122.2.

43.      The term "pollutant" includes "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); 40 C.F.R. § 122.2.

44.      The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

45.      The Act requires all point source discharges of pollutants to waters of the United States be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

46.      Section 402(b) of the Act, 33 U.S.C. § 1342(b), allows each state to administer its own EPA-approved permit program for discharges. In California, EPA has approved the State Board and its nine Regional Boards to administer an NPDES permit program for the State. The State Board and Regional Boards issue individual and general NPDES permits regulating water pollutant discharges from various categories of dischargers.

47.      Section 402(p)(2)(B) of the Act, 33 U.S.C. § 1342(p)(2)(B), requires that NPDES

COMPLAINT                                                                                              9

permits be issued for stormwater discharges "associated with industrial activity."

48.        Section 301(b) of the Act, 33 U.S.C. § 1311(b), requires that, by March 31, 1989, all point source dischargers, including those discharging polluted stormwater, must achieve technology-based effluent limitations by utilizing the Best Available Technology Economically Achievable (BAT) for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology (BCT) for conventional pollutants. *See* 33 U.S.C. § 1311(b); 40 C.F.R. § 125.3(a)(2)(ii)-(iii).

49.        Section 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1), provides for citizen enforcement against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1), 1365(f).

50.        A "person" under the Act includes "individual[s], corporation[s], partnership[s], association[s], State[s], municipalit[ies], commission[s], [and] political subdivision[s] of a State, or any interstate body." 33 U.S.C. § 1362(5). Defendants are persons under the Act.

51.        "Effluent standard or limitation" is defined to include: (a) the prohibition in section 301(a) against unpermitted discharges, and (b) any condition of an NPDES permit such as the Industrial Stormwater Permit. 33 U.S.C. § 1365(f); *Citizens for a Better Env't v. Union Oil Co.*, 83 F.3d 1111, 1114 (9th Cir. 1996) ("Private citizens may bring suit pursuant to 33 U.S.C. § 1365 to enforce effluent standards or limitations, which are defined as including violations of 33 U.S.C. § 1311(a). 33 U.S.C. § 1365(f)(1).")

52.        Section 505(a) of the Act, 33 U.S.C. § 1365(a), authorizes third-party enforcement actions for injunctive relief and section 505(d), 33 U.S.C. § 1365(d), allows a prevailing or substantially prevailing party in an enforcement action to recover litigation costs, including fees for attorneys, experts, and consultants where it finds that such an award is appropriate. 33 U.S.C. § 1365(d).

53.        Clean Water Act violators are currently subject to an assessment of civil penalties of up to $68,445 per day per violation for violations occurring after November 2, 2015. 33 U.S.C. § 1319(d); 40 C.F.R. §§ 19.1-19.4.

**C.     The Industrial Stormwater Permit**

54.          Section 402(p) of the Act establishes the framework regulating industrial stormwater discharges under federal, and authorized state, NPDES permit programs. 33 U.S.C. § 1342(p).

55.          Discharges composed entirely of stormwater are exempt from the Act's permitting requirements unless those discharges are associated with "industrial activity." *See* 33 U.S.C. § 1342(p)(1) and (2); *Natural Res. Def. Council, Inc. v. EPA*, 966 F.2d 1292, 1304-05 (9th Cir. 1992) (detailing EPA's regulations regarding "industrial activity" sources). EPA's implementing regulations at 40 C.F.R. § 122.26 require NPDES permit authorization for facilities engaged in industrial activity that discharge to waters of the United States.

56.          Section 402(b) of the Act, 33 U.S.C. § 1342(b), establishes a framework for regulating industrial stormwater discharges under the NPDES program. States with approved NPDES permit programs are authorized by section 402(b) to regulate industrial stormwater discharges through individual NPDES permits issued to dischargers and/or through the issuance of a single, statewide general NPDES permit applicable to all industrial stormwater dischargers. *See* 33 U.S.C. § 1342(b).

57.          In California, the State Board is charged with regulating pollutants to protect California's water resources.

58.          The State Board elected to issue a statewide general permit applicable to all stormwater discharges associated with industrial activity. The State Board originally issued the Industrial Stormwater Permit on or about November 19, 1991. The State Board modified the Industrial Stormwater Permit on or about September 17, 1992. Pertinent to this action, the State Board reissued the Industrial Stormwater Permit on or about April 17, 1997, and again on or about April 1, 2014, and made amendments on or about August 4, 2015 and November 6, 2018, pursuant to section 402(p) of the Act, 33 U.S.C. § 1342(p).

59.          The Industrial Stormwater Permit is a statewide general NPDES permit issued by the State Board pursuant to section 402 of the Act, 33 U.S.C. § 1342(b), and 40 C.F.R § 123.25. The Industrial Stormwater Permit Order 2014-0057-DWQ, as amended by Order No. 2015-0122-

DWQ in 2015 and by Order 2018-0028-DWQ in 2018, is the currently applicable Industrial Stormwater Permit for industrial stormwater discharges in California. The current version of the Industrial Stormwater Permit went into effect on July 1, 2020.

60.    In order to discharge stormwater associated with industrial activities lawfully in California, industrial dischargers (i.e., facility operators) must secure coverage under the Industrial Stormwater Permit by filing a notice of intent and comply with the Industrial Stormwater Permit's terms or obtain and comply with an individual NPDES permit. Industrial Stormwater Permit, §§ I.A (Findings 8, 12, 17), Attachment C (defining "discharger").

61.    Compliance with the Industrial Stormwater Permit constitutes compliance with the Act for purposes of stormwater discharges. 33 U.S.C. §§ 1311(b)(2)(A), 1311(b)(2)(E). Conversely, "[Industrial Stormwater] Permit noncompliance constitutes a violation of the Clean Water Act and the [California] Water Code." Industrial Stormwater Permit, § XXI.A.

62.    The Industrial Stormwater Permit requires dischargers comply with technology-based standards established in the Act. 33 U.S.C. § 1311(b); Industrial Stormwater Permit, § V.A. The Industrial Stormwater Permit incorporates these technology-based standards as "Effluent Limitations."

63.    The Effluent Limitations require dischargers to reduce or prevent pollutants associated with industrial activity in stormwater discharges through the implementation of pollution controls. For toxic and non-conventional pollutants, this requires the Best Available Technology Economically Achievable ("BAT"). *See* Industrial Stormwater Permit, § V.A; *see also* 40 C.F.R. § 401.15 (listing toxic pollutants, including copper, lead, and zinc).

64.    For conventional pollutants this requires the Best Conventional Pollutant Control Technology ("BCT") (collectively, the technology based effluent limitations are referred to as "BAT/BCT"). *See* Industrial Stormwater Permit, § V.A; *see also* 40 C.F.R. § 401.16 (listing conventional pollutants, including TSS, oil and grease, and pH).

65.    Compliance with the BAT/BCT standard requires all dischargers to implement pollution control measures—called Best Management Practices ("BMPs")—that reduce or prevent discharges of pollution in their stormwater discharge in a manner that reflects best industry

practice.

66.        EPA has developed benchmark levels ("Benchmarks") that are objective guidelines to evaluate whether a permittee's BMPs achieve compliance with the BAT/BCT standards. Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Industrial Activities ("Multi-Sector Permit"), 86 Fed. Reg. 10269, 10272 (Feb. 19, 2021); Multi-Sector Permit, 80 Fed. Reg. 34,403, 34,405 (June 16, 2015); Multi-Sector Permit, 73 Fed. Reg. 56,572, 56,574 (Sept. 29, 2008); Multi-Sector Permit, 65 Fed. Reg. 64,746, 64,766-67 (Oct. 30, 2000).

67.        According to EPA's Sector-Specific Requirements for Sectors N and P, polluted discharges from scrap recycling and waste recycling facilities and local trucking without storage, such as the Facility, contain polycyclic aromatic hydrocarbons (PAHs), TSS, COD, aluminum, lead, copper, and zinc. The Industrial Stormwater Permit recommends these "[i]ndicator parameters" be used to aid compliance evaluations; "[f]or example, [COD] concentrations can indicate the presence of dissolved organic compounds, like residual food from collected recycling materials." Industrial Stormwater Permit, Fact Sheet § II.J.3.b.

68.        The Industrial Stormwater Permit includes Numeric Action Limits ("NALs") that are based on EPA's Benchmarks. *Id.* at § I.N (Finding 76). The NALs do not strictly represent technology-based effluent limitations. *Id.* at § I.N (Finding 77). However, they do indicate "the overall pollutant control performance at any given facility." *Id.* at § I.N (Finding 75).

**D.        The Stormwater Pollution Prevention Plan**

69.        The Industrial Stormwater Permit requires the preparation and implementation of a Storm Water Pollution Prevention Plan prior to conducting, and in order to lawfully continue, industrial activities. Industrial Stormwater Permit, § X. To comply with the Industrial Stormwater Permit, dischargers must have developed and implemented a SWPPP by July 15, 2015, including the description of BMPs that comply with the BAT/BCT standard. *See* Industrial Stormwater Permit, §§ X.B-C.

70.        The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of stormwater and authorized non-stormwater

discharges from the facility. *Id*. at § X.G. The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in stormwater and authorized non-stormwater discharges. *Id*. at § X.H. The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. *Id*. at §§ I.D (Finding 32), V.A.

71.         The SWPPP must include, among other things, a narrative description and assessment of all industrial activity, potential sources of pollutants, and potential pollutants; a site map indicating the stormwater conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of stormwater management practices; a description of the BMPs developed and implemented to reduce or prevent pollutants in stormwater discharges and authorized non-stormwater discharges necessary to comply with the Industrial Stormwater Permit; the identification and elimination of non-stormwater discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities, and the identification of individuals and their current responsibilities for developing and implementing the SWPPP. *Id*. at §§ X.A-H.

72.         A SWPPP must also describe each industrial process occurring at a facility, and the assessment of potential pollutant sources ("Source Evaluation and Pollutant Assessment"). *See id*. at §§ X.C, X.F, X.G

73.         Each of the industrial processes and all industrial activities undertaken at the Facility are pollutant sources that must be described and assessed for their potential contribution of pollutants in stormwater discharges in the SWPPP's Source Evaluation and Pollutant Assessment.

74.         The Industrial Stormwater Permit also requires facility operators to "properly operate and maintain any facilities and systems of treatment and control … installed or used … to achieve compliance with the conditions of [the Industrial Stormwater Permit]" and requirements

of the SWPPP at all times. *Id*. at § XXI.F.

75.        The SWPPP and site maps must be evaluated and revised at least annually to ensure ongoing compliance. *Id*. at §§ I.K (Finding 69), X.B.1. Any failure to develop, implement, or revise a comprehensive SWPPP that contains all required elements is a violation of the Industrial Stormwater Permit, and creates liability under the Act. Industrial Stormwater Permit, § X.B; *see also* Industrial Stormwater Permit, Fact Sheet § II.I.1.

### E.        The Monitoring Implementation Plan

76.        Permittees must develop and implement a stormwater monitoring and reporting program—called a Monitoring Implementation Plan ("MIP")—prior to conducting, and in order to lawfully continue, industrial activities. *See* Industrial Stormwater Permit, §§ X.I, XI.A-D. The MIP must be included in the SWPPP. *See* Industrial Stormwater Permit, § X.A.8. The objective of the MIP is to detect and measure concentrations of pollutants in a facility's stormwater discharges, and to ensure compliance with the Industrial Stormwater Permit's Effluent Limitations and Receiving Water Limitations. *See* Industrial Stormwater Permit, Fact Sheet § II.J.1. A lawful MIP ensures that BMPs are effectively reducing and/or eliminating pollutants in a facility's stormwater discharges and is evaluated and revised whenever appropriate to ensure ongoing compliance with the Industrial Stormwater Permit. *Id*.

77.        Facility operators must complete stormwater sampling and analysis. Industrial Stormwater Permit, § XI.B. The Industrial Stormwater Permit requires the collection and analysis of two stormwater samples from a Qualifying Storm Event ("QSE") between July 1 and December 31 of each reporting year, and two samples from a QSE between January 1 and June 30 of each reporting year. Industrial Stormwater Permit, § XI.B.2. Each sample must be collected within four hours of the start of a discharge, or the start of facility operations if the QSE occurs within the previous 12-hour period. Industrial Stormwater Permit, § XI.B.5.

78.        Permittees must also conduct visual observations at least once a month, and at the same time sampling occurs at each discharge location. Industrial Stormwater Permit, § XI.A. Observations must document the presence of any floating and suspended material, oil and grease, discolorations, turbidity, or odor, and identify the source of any pollutants. Industrial Stormwater

Permit, § XI.A.2. Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants observed in stormwater discharges. Industrial Stormwater Permit, § XI.A.3.

79.     The Industrial Stormwater Permit requires dischargers to analyze samples for, among other parameters, TSS, oil and grease, and pH; parameters identified during the pollutant source assessment; parameters identified in Table 1 of the Industrial Stormwater Permit based on the facility's standard industrial classification ("SIC") code, and applicable industrial parameters related to receiving waters with 303(d) listed impairments or approved Total Maximum Daily Loads. *Id*. at §§ XI.B.6.a-e.

80.     The Industrial Stormwater Permit requires operators of facilities that fall under SIC Code 5093, such as the Facility, to analyze stormwater samples for iron, lead, aluminum, zinc, and COD. *Id*. at Table 1.

81.      Dischargers must submit all sampling and analytical results for all samples via the State Board's Stormwater Multiple Application and Report Tracking System ("SMARTS") database within 30 days of obtaining the results for each sampling event. *Id*. at § XI.B.11.a.

82.     Dischargers that fail to develop and implement an adequate MIP that includes both visual observations, and sampling and analysis are in violation of the Industrial Stormwater Permit, and consequently the Clean Water Act. *Id*. at § II.J.3

### F.     Exceedance Response Actions Requirements

83.     The Industrial Stormwater Permit requires dischargers to complete certain Exceedance Response Actions (ERAs) based on stormwater sampling results in order to assist dischargers in complying with the Industrial Stormwater Permit. *Id*. at § I.M (Finding 64).

84.     When the Industrial Stormwater Permit became effective on July 1, 2015, all dischargers were in "Baseline status." *See id*. at § XII.B.

85.     A discharger's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate an exceedance of an annual average or instantaneous NAL for that parameter. *Id*. at § XII.C.

86.     Level 1 status commences on July 1 following the reporting year during which the

exceedance(s) occurred. *See id*. at § XII.C. By October 1 following commencement of Level 1 status, dischargers are required to "complete an evaluation, with the assistance of a [Qualified Industrial Stormwater Practitioner (QISP)], of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s), and identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the [Industrial Stormwater] Permit." *See id*. at §§ XII.C.1.a-c.

87.        Based upon this Level 1 status evaluation, the discharger is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via the State Board's Stormwater Multiple Application and Report Tracking System (SMARTS) database a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded an NAL. *See id*. at § XII.C.2.a.i-ii.

88.        A discharger in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. *See id*. at § XII.C.2.a.iii.

89.        A discharger in Level 1 status for a parameter will return to Baseline status once the discharger has completed the Level 1 ERA Report and implemented all identified additional BMPs, and results from four consecutive QSEs that were sampled subsequent to BMP implementation indicate no additional NAL exceedances for that parameter. *See id*. at § XII.C.2.b.

90.        A discharger in Level 1 status for any parameter changes to Level 2 status on July 1 following the reporting year in which the NAL exceedance(s) occurred for that same parameter. *See id*. at § XII.D.

91.        By January 1 following commencement of Level 2 status, the discharger is required to submit via SMARTS a Level 2 ERA Action Plan to address NAL exceedance(s) in the drainage areas where the NAL exceedances occurred. *See id*. at §§ XII.D.1.a-e. The Level 2 ERA Action Plan must include a schedule and detailed description of the tasks required to complete the

discharger's selected demonstration(s). *Id*. The discharger is required to submit via SMARTS a Level 2 ERA Technical Report by January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan. *See id*. at §§ XII.D.2.a-c.

92.    A discharger must annually update the Level 2 ERA Technical Report based upon additional information, including additional NAL exceedances of the same parameter and same drainage area, facility operational changes, pollutant source(s) changes, and/or information that becomes available via compliance activities. *See id*. at § XII.D.3.c. If there are no changes requiring an update of the Level 2 ERA Technical Report, then the discharger will certify in the Annual Report that there have been no changes warranting updating the Level 2 ERA Technical Report. *See id*. at § XII.D.3.c.

### G.    Annual Reports

93.    The Industrial Stormwater Permit requires dischargers to certify and submit via SMARTS an Annual Report by July 15 following each reporting year. *See id*. at § XVI.A.

94.    The Annual Report shall include: a compliance checklist indicating whether a discharger complies with and has addressed all applicable requirements of the Industrial Stormwater Permit; an explanation for any non-compliance of requirements within the reporting year; an identification of all revisions made to the SWPPP within the reporting year, and the date of the Annual Evaluation. *See id*. at §§ XVI.B.1-4.

95.    Question 3 in the Annual Report asks: "Did you sample the required number of Qualifying Storm Events during the reporting year for all discharge locations, in accordance with Section XI.B?"

96.    Question 13 in the Annual Report asks: "Did additional NAL exceedances occur in the same drainage area for the facility's Level 2 parameter(s) (if no Level 2 parameters, select No)?"

97.    Question 14 in the Annual Report asks: "Was the Level 2 ERA Technical Report updated (if no Level 2 parameters, select No)?"

### V.    FACTUAL ALLEGATIONS

#### A.    Defendants' Operations and Stormwater Discharges

98.     Defendants own and/or operate the Facility.

99.     Defendants discharge stormwater to the Berkeley MS4, then to Central San Francisco Bay at the Gilman Street Outfall.

100.    Central San Francisco Bay is a water of the United States.

101.    The Facility is regulated by the Industrial Stormwater Permit.

102.    The owners/operators of the Facility submitted a Notice of Intent to comply with the Industrial Stormwater Permit to the State Board on or around June 11, 2015.

103.    Industrial activities at the Transfer Station generally consist of, accepting solid waste at the transfer station and tipping floor, processing and transporting solid waste, equipment maintenance, storage of used oil, fueling, washing equipment, maintenance of containers, storage of containers, bins, and hazardous waste, receiving and processing green waste, construction debris, electronic waste, and general waste, and operation of equipment in support of these activities.

104.    Industrial activities at the Recycling Center include but are not limited to: processing recyclables (i.e., plastic, glass and paper) collected by residential curbside, commercial pick-up, buyback, and drop-off recycling programs.

105.    The owners/operators of the Facility have self-identified the Facility as falling under SIC codes 4212 ("Local Trucking without Storage"), and 5093 ("Scrap and Waste Materials").

106.    Operations at the Facility cause pollutants to be exposed to rainfall.

107.    Pollutants generated at the Facility are exposed to stormwater flows.

108.    Activities at the Facility generate significant debris and particulate matter, which contain pollutants and settle on surfaces within the Facility. During rain events, this pollution washes off of those surfaces and into stormwater discharge points, which flow to San Francisco Bay.

109.    The types of pollutants that the Facility releases into the immediate environment are known to include or have the potential to include lead, oil and grease, aluminum, TSS, iron, COD, zinc, copper, dust, debris, metal particulates, acidic fluids, volatile organics, and other

COMPLAINT                                                                                                19

pollutants.

110.        The Facility's sampling results since December 18, 2020, indicate that the Facility's stormwater discharges have consistently exceeded Benchmarks for TSS, COD, O&G, iron, aluminum, copper, lead, and zinc.

111.        Neither the Facility's past nor current SWPPPs include adequate BMPs designed to reduce pollutant levels in discharges to BAT and BCT levels.

112.        The Facility's SWPPP fails to include the information required by the Industrial Stormwater Permit. Specifically, the Defendants have failed to evaluate the effectiveness of the Facility's BMPs and to revise the SWPPP, despite revisions being necessary; have failed to develop and implement an adequate site map; and, have failed to describe and evaluate the industrial materials and potential pollutant sources at the Facility, all of which have resulted in the Facility's numerous continuing effluent limitation violations. Moreover, Baykeeper has identified the following additional SWPPP deficiencies: Failure to identify in the Site Map and SWPPP the portions of any drainage area impacted by discharges from surrounding areas (i.e., run on from Codornices Creek and railroad tracks); and failure to describe in the SWPPP the containment capacity for areas protected by containment structures.

113.        Defendants have failed to develop and implement an adequate monitoring and reporting program for the Facility as required by the Industrial Stormwater Permit. Specifically, Defendants failed to collect any stormwater samples for the 2021-2022 reporting year and failed to collect the required number of stormwater samples in each of the other reporting years over the past five years.

114.        Based on self-reported data from stormwater samples, as of July 1, 2016, the Facility entered Level 1 status for TSS, COD, O&G, aluminum, copper, iron, and zinc based on NAL exceedances during the 2015-2016 reporting period.

115.        Based on self-reported data from stormwater samples, as of July 1, 2017, the Facility entered Level 2 status for TSS, COD, aluminum, copper, iron, and zinc and Level 1 status for pH based on NAL exceedances during the 2016-2017 reporting period.

116.        Based on self-reported data from stormwater samples, from July 1, 2021 to the

present, the Facility remained in Level 2 status for TSS, COD, O&G, aluminum, copper, iron, and zinc based on NAL exceedances during the 2020-2021, 2021-2022, 2022-2023, 2023-2024, and 2024-2025 reporting periods.

117.    The Facility's Level 2 ERA Technical Reports for TSS, COD, aluminum, copper, iron, and zinc, prepared in December 2018, March 2019, May 2022, and February 2025, recommended additional BMPs, including the assertion that the Facility was scheduled to be modernized and replaced.

118.    However, the BMPs identified in the Facility's updated Level 2 ERA Technical Reports were insufficient to prevent NAL exceedances at the Facility and, in fact, did not achieve adequate reductions in pollutant concentrations in the Facility's stormwater discharges, *see* Industrial Stormwater Permit § XII.D, as evidenced by the fact that sampling results from the 2022-2023, 2023-2024 and 2024-2025 reporting periods showed continued exceedances of TSS, COD, aluminum, copper, iron, and zinc. Based on information and belief, the Facility replacement project does not appear to be moving forward.

119.    The Facility did not submit on SMARTS an updated Level 2 ERA Technical Report in 2020, 2021, 2023 or 2024.

120.    The Facility failed to identify additional BMPs "necessary to prevent future NAL exceedances" at the Facility and to comply with the requirements of the Industrial Stormwater Permit as exceedances continued. *See* Industrial Stormwater Permit §§ XII.C.1.c, XII.C.2.a.ii.

121.    The Facility's 2020-2021, 2021-2022, 2022-2023, 2023-2024, and 2024-2025 Annual Reports were certified as "true, accurate, and complete" and in compliance with the Industrial Stormwater Permit.

122.    In response to Question 3, which asks whether permittees sampled the required four QSEs per year, the Facility's 2023-2024 Annual Report states the Facility collected samples from two QSEs during the reporting period, but the Facility only sampled one QSE during that reporting year.

123.    In response to Question 13, which asks whether additional NAL exceedances occurred in the same drainage area for the facility's Level 2 parameter(s), the Facility's 2020-

2021, 2021-2022, and 2024-2025 Annual Reports answered in the negative. But the Facility's

self-reported stormwater sampling has consistently had NAL exceedances over the past five years.

124.         In response to Question 14, which asks whether the Level 2 ERA Technical Report

was updated, the Facility's 2022-2023 Annual Report states the Level 2 ERA Technical Report

will be updated, and the 2024-2025 Annual Report states the Level 2 ERA Technical Report was

updated in February 2025. But the Facility did not submit an updated report during the 2022-2023

reporting year, and the update from February 2025 was submitted on SMARTS on December 3,

2025.

**B.         Activities Contributing to Clean Water Act Violations**

125.         Defendants have not developed and/or implemented an adequate SWPPP at the

Facility.

126.         Defendants have not developed and/or implemented BMPs that adequately

minimize the exposure of pollutants to stormwater at the Facility.

127.         Defendants have not developed and/or implemented BMPs at the Facility that

adequately control and minimize polluted runoff from the Facility.

128.         Defendants have not developed and/or implemented BMPs at the Facility that

adequately treat and remove pollutants in stormwater prior to discharge.

129.         Defendants have not developed and/or implemented adequate measures to reduce

or eliminate stormwater pollution that constitute BAT/BCT.

130.         Defendants have not developed and/or implemented adequate BMPs at the Facility

to achieve stormwater discharges that meet Benchmarks or NALs.

131.         Defendants have not adequately evaluated and revised the Facility's SWPPP to

address these failures.

132.         Defendants have failed to properly operate and maintain the structures and systems

that have been put in place at the Facility to achieve compliance with the Industrial Stormwater

Permit and its SWPPP requirements.

133.         Defendants have not developed and/or implemented an adequate monitoring and

reporting program at the Facility.

134.    Defendants' monitoring and reporting activities have not resulted in practices that adequately reduce or prevent pollutants from discharging from the stormwater flows from the Facility.

135.    Defendants' monitoring activities have not effectively identified compliance problems at the Facility or resulted in effective revisions of the SWPPP.

136.    Due to Defendants' lack of effective pollution prevention measures, including effective BMPs, and its failure to implement an effective monitoring and reporting program, stormwater from the Facility becomes polluted with many constituents. Pollutants become entrained in stormwater when such water flows over and across the outdoor areas of the Facility.

137.    Defendants' annual stormwater sampling results indicate that the Facility's discharges of stormwater are consistently contaminated with higher levels of pollutants than are permissible under the Industrial Stormwater Permit and the Act.

138.    Defendants' annual stormwater sampling results indicate that the Facility's discharges of stormwater are regularly contaminated with higher levels of pollutants than are consistent with BMPs that constitute BAT/BCT.

139.    Defendants' annual stormwater sampling results indicate that the Facility's discharges of stormwater contain pollutants at levels that contribute to impairment of the Receiving Waters, are detrimental to fish and aquatic dependent wildlife, expose people using the Receiving Waters to toxins, and reduce the special social, economic, and aesthetic benefits of the Receiving Waters.

140.    Defendants' repeated stormwater exceedances of Benchmarks and NALs since December 18, 2020, for pollutants, including aluminum, COD, copper, iron, O&G, TSS and zinc, indicate that Defendants have failed and continue to fail to meet BAT/BCT.

VI.    **CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Discharges in Excess of Effluent Limitations in Violation of the**

**Industrial Stormwater Permit and the Clean Water Act**

**(Violations of 33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))**

141.        Plaintiff incorporates the allegations contained in paragraphs 1 – 140 as though fully set forth herein.

142.        The Act and the Industrial Stormwater Permit include effluent limitations, which prohibit the discharge of pollutants from the Facility in concentrations above the level commensurate with the application of BAT for toxic pollutants and BCT for conventional pollutants.

143.        Defendants have discharged and continue to discharge stormwater from the Facility containing levels of pollutants that do not achieve compliance with the BAT/BCT requirements during every significant rain event (defined by EPA as a rainfall event generating 0.1 inches or more of rain) occurring from December 18, 2020, through the present. *See* **Exhibit 1**, Notice Letter at Attachment 2. Defendants' failure to develop and/or implement BMPs adequate to achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a violation of the Industrial Stormwater Permit and the Act. *See* Industrial Stormwater Permit, §§ I.D (Finding 32), V.A; 33 U.S.C. § 1311(b).

144.        Each day, since at least December 18, 2020, that Defendants have discharged stormwater from the Facility containing pollutants in excess of BAT/BCT requirements is a separate and distinct violation of section 301(a) of the Act, 33 U.S.C. § 1311(a).

145.        Defendants' Act violations described in the paragraphs above will continue in the future, as violations of Sections I.D and V.A of the Industrial Stormwater Permit, until Defendants develop and implement BMPs at the Facility adequate to achieve pollutant discharge reductions attainable via BAT and BCT.

146.        By committing the acts and omissions alleged above after November 2, 2015, Defendants are subject to an assessment of civil penalties for each and every violation of the Act in the amount of up to $68,445 per day.

147.        An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

148.         An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

## SECOND CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the Industrial Stormwater Permit

### (Violations of 33 U.S.C. §§ 1311, 1342, 1365(a) and 1365(f))

149.         Plaintiff incorporates the allegations contained in paragraphs 1 – 140 as though fully set forth herein.

150.         The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement an adequate Storm Water Pollution Prevention Plan ("SWPPP") when they commence industrial activity. Industrial Stormwater Permit, § X.B.

151.         Defendants, as of at least December 18, 2020, have commenced industrial activity and continue to conduct industrial activity at the Facility.

152.         Defendants have failed and continue to fail to develop and implement an adequate SWPPP or implement all necessary revisions to the SWPPP for the Facility as required by the Industrial Stormwater Permit.

153.         Defendants have failed and continue to fail to develop or implement a SWPPP for the Facility that includes BMPs adequate to meet the requirements of Section X of the Industrial Stormwater Permit.

154.         Defendants have failed and continue to fail to adequately develop or implement a SWPPP at the Facility that prevents discharges from violating the Effluent Limitations of the Industrial Stormwater Permit.

155.         Each and every violation of the Industrial Stormwater Permit's SWPPP requirements at the Facility is a separate and distinct violation of Act section 301(a), 33 U.S.C. § 1311(a).

156.         Defendants have been in violation of the Industrial Stormwater Permit's SWPPP requirements every day since December 18, 2020. Defendants will continue to be in violation of

COMPLAINT                                                                                                          25

the SWPPP requirements each day that Defendants fail to develop and fully implement an adequate SWPPP for the Facility.

157.    By committing the acts and omissions alleged above after November 2, 2015, Defendants are subject to an assessment of civil penalties for each and every violation of the Act in the amount of up to $68,445 per day.

158.    An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

159.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

### THIRD CAUSE OF ACTION

### Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan in Violation of the Industrial Stormwater Permit and the Clean Water Act

### (Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))

160.    Plaintiff incorporates the allegations contained in paragraphs 1 – 140 as though fully set forth herein.

161.    The Industrial Stormwater Permit requires dischargers of stormwater associated with industrial activity to develop and implement a stormwater monitoring and reporting program, called a Monitoring Implementation Plan ("MIP"), prior to commencing industrial activity. Industrial Stormwater Permit, §§ X.I, XI.A-D.

162.    Defendants have failed and continue to fail to adequately develop, implement, or revise a qualifying and adequate MIP for the Facility in violation of the Industrial Stormwater Permit and Act.

163.    Defendants have been in violation of the Industrial Stormwater Permit's MIP requirements every day since December 18, 2020.  Defendants will continue to be in violation of the MIP requirements each day that Defendants fail to develop and fully implement an adequate

1  MIP for the Facility.

2  164.      Each and every violation of the Industrial Stormwater Permit's MIP requirements

3  at the Facility is a separate and distinct violation of the Act.

4  165.      By committing the acts and omissions alleged above after November 2, 2015,

5  Defendants are subject to an assessment of civil penalties for each and every violation of the Act

6  in the amount of up to $68,445 per day.

7  166.      An action for injunctive relief is authorized by Act section 505(a), 33 U.S.C. §

8  1365(a).  Continuing commission of the acts and omissions alleged above will irreparably harm

9  Plaintiff and Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy

10  at law.

11  167.      An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an

12  actual controversy exists as to the rights and other legal relations of the Parties.

13        WHEREFORE, Plaintiff prays for judgment against Defendants as set forth below.

14                        **FOURTH CAUSE OF ACTION**

15  **Failure to Report as Required in Violation of the Industrial Stormwater Permit and the**

16                              **Clean Water Act**

17        **(Violations of 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f))**

18  168.      Plaintiff incorporates the allegations contained in paragraphs 1 – 140 as though

19  fully set forth herein.

20  169.      Section XVI of the Industrial Stormwater Permit requires dischargers to submit an

21  Annual Report each reporting year to the Regional Board. The Annual Report must include a

22  compliance checklist, certifying compliance with the Industrial Stormwater Permit and an

23  explanation of any non-compliance. *See* Industrial Stormwater Permit, Section XVI.B.

24  170.      The Industrial Stormwater Permit also requires dischargers who exceed NALs to

25  comply with Exceedance Response Actions. *Id.*, Section XII.

26  171.      Defendants have failed to accurately report their non-compliance with the

27  Industrial Stormwater Permit and correctly report stormwater sampling analysis compliance in the

28  Facility's Annual Reports.

172.       Defendants have been in violation of Sections XVI and XX of the Industrial Stormwater Permit since at least December 18, 2020.

173.       Defendants' violations of the Industrial Stormwater Permit's reporting requirements and the Act are ongoing and continuous.

174.       Defendants are subject to an assessment of civil penalties for each and every violation of the Industrial Stormwater Permit and Act occurring from December 18, 2020 to the present, pursuant to sections 309(d) and 505 of the Act. 33 U.S.C. §§ 1319(d), 1365; 40 C.F.R. § 19.4.

175.       An action for injunctive relief is authorized by section 505(a) of the Act. 33 U.S.C. § 1365(a). Continuing commission of the actions and omissions alleged above would irreparably harm Plaintiff and the residents of the State of California, for which there is no plain, speedy, or adequate remedy at law.

176.       An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

WHEREFORE, Plaintiff prays for judgment against Defendants as set forth hereafter.

## VII.   PRAYER FOR RELIEF

Plaintiff respectfully requests this Court to grant the following relief:

1.       Judgment for Plaintiff in this matter enjoining Defendants from discharging pollutants from the Facility to stormwater discharge points, which discharge to San Francisco Bay, in violation of the Clean Water Act.

2.       A Court Order declaring:

a.   Defendants to have violated and to be in violation of the Clean Water Act for failing to meet effluent limitations which include the Best Available Technology Economically Achievable and Best Conventional Pollutant Control Technology requirements;

b.   Defendants to have violated and to be in violation of the Clean Water Act for failing to develop, implement, and/or revise an adequate SWPPP under

the Industrial Stormwater Permit;

    c.   Defendants to have violated and to be in violation of the Clean Water Act for failing to develop, implement, and/or revise an adequate MIP under the Industrial Stormwater Permit;

    d.   Defendants to have violated and to be in violation of the Clean Water Act for failing to comply with the reporting requirements of the Industrial Stormwater Permit; and,

3.      A Court Order ordering Defendants to restore all receiving waters damaged by Defendants' illegal discharges of pollutants from the Facility;

4.      A Court Order enjoining Defendants from violating sections 301(a) and (b) and section 402(p) of the Clean Water Act and from violating the substantive and procedural requirements of the Industrial Stormwater Permit at the Facility;

5.      A Court Order assessing civil monetary penalties against Defendants for each violation of the Clean Water Act in the amount of $68,445.00 per day per violation;

6.      A Court Order awarding Plaintiff its reasonable costs of suit, including attorney, witness, and consultant fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

7.      Award other relief as this Court may deem just and appropriate.


Dated: XXX XX, 2026               Respectfully Submitted,

LAW OFFICE OF WILLIAM CARLON

/s/ William Carlon

William Carlon

Counsel for Plaintiff San Francisco Baykeeper



SAN FRANCISCO BAYKEEPER

/s/ Nicole C. Sasaki

Nicole C. Sasaki
Eric J. Buescher
Christina D. Ralston

Counsel for Plaintiff San Francisco Baykeeper

COMPLAINT                                                                 30